**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

KAREN ZARZA,

               Plaintiff,

v.                                      Case No. 18-13862

BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN,

               Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Karen Zarza[1] brings this action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, against Defendant, Board of Regents of the University of Michigan, following Defendant terminating the employment of one of Plaintiff's subordinates at the University of Michigan. Plaintiff alleges that Defendant discriminated against her fellow employee based on the employee's disability. (ECF No. 48, PageID.966.) The crux of Plaintiff's allegations is that Defendant—Plaintiff's former employer—fired Plaintiff in retaliation for her attempts to advocate for the disabled employee. (*Id.*)

Before the court is Defendant's Motion for Summary Judgment, which seeks the entry of judgment against Plaintiff on her only remaining claim, Count I, for retaliation under the Rehabilitation Act. (ECF No. 44.) Plaintiff filed a response (ECF No. 48), and

---

[1]     Plaintiff unexpectedly passed away on August 8, 2021. The court substituted her son Joshua Zarza as a party in interest. (ECF No. 50.)

Defendant submitted a reply. (ECF No. 51.) The motion has been thoroughly briefed, and the court concludes that a hearing is not necessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the court will grant Defendant's motion and enter judgment against Plaintiff.

## I. BACKGROUND

Plaintiff began working for Defendant in 2003. (ECF No. 48, PageID.969.) She worked as a supervisor in Defendant's Custodial and Grounds Department from 2005 until her termination in November 2017. (*Id.*) At least one fellow supervisor, Ken Sawicki, described her as a "competent," "tough," and "effective" supervisor who was mostly fair in her role. (ECF No. 48-10, PageID.1122.) Supervisors such as Plaintiff attended various trainings regarding federal anti-discrimination laws. (ECF No. 48-5, PageID.1049-50.)

On approximately August 26, 2015, Defendant terminated one of Plaintiff's subordinate employees, Robert Taylor. Nearly two years later on May 8, 2017, Taylor filed a *pro se* disability discrimination complaint against Defendant in federal court, alleging in relevant part that (1) he sustained injuries on the job that rendered him unable to work; (2) Defendant both "refused" and "failed to offer any reasonable accommodation within his current role or any other vacant role in the organization for which [he] was qualified," despite his requests for accommodations; and (3) ultimately was terminated from his employment due to his disability. (ECF No. 48-4, PageID.1029-1037.) Plaintiff, three days after Taylor filed his lawsuit, requested to meet with Defendant's Facilities and Operations ("F&O") Director John Lawter. (ECF No. 48-11, PageID.1125.) Lawter agreed, and on May 11, 2017, Lawter met with Plaintiff and fellow

Supervisors Vershawn Miller and Ken Sawicki. (ECF No. 48, PageID.969-70.) Most of the conversation initially revolved around Taylor, including whether he was properly accommodated. (ECF No. 48-12, PageID.1145.) Lawter, in his deposition, specifically noted that Plaintiff and the others "were claiming that [Collette] Donner said she accommodated him but we didn't." (*Id.*) The four individuals further discussed how Taylor "was suing U of M" and how the supervisors were "concerned about their positions" due to any potential vindictiveness from Collette Donner, Defendant's Custodial and Grounds Service Department Area Manager who was alleged to be one of the individuals who did not accommodate Taylor's disability restrictions. (*Id.*; ECF No. 48, PageID.970.) According to Plaintiff, she also informed Lawter that if she were called as a witness to testify for Taylor—something she believed was a possibility at the time—she "intended to tell the truth" and "would not perjure [her]self." (ECF No. 48-6, PageID.1072.) Miller recalls Lawter's face turning "beet red" at this time, although Miller apparently speculated as to the reason why. (ECF No. 44-12, PageID.897-98.) Sawicki recalls the tone of the meeting be uncomfortable because it was "very accusatory," such that Lawter felt "surprised and defensive."[2] (ECF No. 44-13, PageID.903.)

On May 16, 2017, Custodial and Grounds Business Manager Kristen Brancheau sent an email to human resources employee Sabrina Garrett-Owens to discuss the May 11 meeting. (ECF No. 48-15, PageID.1158.) Brancheau stated, in relevant part:

---

[2]     Plaintiff would four months later write a letter to Defendant's human resources department stating that, at this meeting, Lawter warned of "collusion" and informed her that Defendant would "provide [her] the information [she] will use" if she testified in one of Taylor's lawsuits. (ECF No. 48-34, PageID.1289.) The letter would also recall Plaintiff discussing a pending "Federal Lawsuit against the University" in which she had "been named as a witness." (*Id.*)

It is my understanding that Karen might testify for Robert Taylor in his court case, basically stating that [Donner] was out to get him, we didn't accommodate his restrictions, etc.

She also made claims . . .  that [Donner] is vindictive and out to get her and [Miller]. She alleges she changes their incident reports, etc.

So now I get to provide detail on all of this. You know what a nightmare case Robert's was, ugh. When the evidence shows that Karen is not accurate, can we finally discipline her for this?

(ECF No. 48-15, PageID.1158.) Garrett-Owens replied, "Wow! If the evidence clearly shows that Karen is wrong, then I think [Lawter] can do more than fire her." (*Id.*) The following day, on May 17, 2017, Lawter informed Plaintiff that there was "no evidence to support her claims on [Donner]." (ECF No. 48-12, PageID.1146.)

On June 22, 2017, Defendant circulated a litigation hold letter that instructed its addressees, including Plaintiff, to "preserve all information related to the claims of Robert Taylor" due to the filing "of a lawsuit brought by Mr. Taylor against the University, arising out of his employment with the University." (ECF No. 48-20, PageID.1223.) Six days later, Plaintiff met with Brancheau and F&O Associate Director of HR Leti Rastigue. (ECF No. 48-21, PageID.1227.) At the meeting, according to Brancheau's notes, they apparently discussed Taylor's state workers' compensation proceeding and the fact that Plaintiff believed Defendant "received appropriate medical documentation" but that Donner "would not accept medical documentation." (*Id.*)

Just over two months later, on September 5, 2017, a supervisor in the Custodial and Grounds Department, Scott Price, contacted Donner to discuss complaints about Plaintiff. (ECF No. 44-3, PageID.829.) Price wanted to discuss Plaintiff's treatment of Price and other employees. (*Id.*) Although he did not recall witnessing anything spurring him to immediately complain, Price stated there was a "last straw" and "cumulation of

4

information over time" to the point of feeling "an obligation" to discuss his feelings with Donner. (*Id.*) Defendant intimates that this meeting was the "origin" of the investigation into Plaintiff's conduct that ultimately led to her termination; Defendant contends that the termination of Plaintiff's employment had "nothing whatsoever to do with Robert Taylor," to which Garrett-Owens would later testify in her deposition. (ECF No. 44, PageID.756; ECF No. 48-8, PageID.1103-04.)

On September 6, 2017, Price met with Lawter, to whom Donner reported. (ECF No. 44-5, PageID.846; ECF No. 44-4, PageID.840.) Price explained that Plaintiff "verbally berated him" and is otherwise "negative" or "toxic" in the workplace, had been previously warned about gossip by human resources, and shows favoritism to particular employees. (ECF No. 44-5, PageID.846.) Lawter, the next day, e-mailed Rastigue to advise her that Lawter's department would be investigating complaints concerning Plaintiff and that both Brancheau and Donner would be participating. (ECF No. 44-6, PageID.849.) Having learned details of the investigation, Lawter placed Plaintiff on administrative leave at some point between this date and September 11, although Plaintiff was not informed until September 13. (ECF No. 44, PageID.760; ECF No. 48, PageID.982.)

Brancheau personally interviewed custodians, and Price played a role in gathering employees who were interested in being interviewed. (ECF No. 44-3, PageID.832.) Price noted in his deposition that he gathered employees who, he had heard, struggled with Plaintiff's conduct in the past, and those encompassed both employees who worked for Karen and "people from [Price's] shop too." (ECF No. 44-3, PageID.832-33.) Brancheau took handwritten notes of the interviews and created a

twelve-page, typed report regarding her investigation. (ECF No. 44-8; ECF No. 48-19.)
As noted by Brancheau in her report, the employees were consistent in "their
complaints that [Plaintiff] is a very mean, unprofessional, unpleasant person to work
for." (ECF No. 48-19, PageID.1210.) Many employees discussed their fear of Plaintiff's
retaliation. (*Id.*, PageID.1214, 1219-20; ECF No. 44-8, PageID.856.)

Brancheau sent the final report to Lawter and Rastigue just past midnight on
September 13, 2017, and later that the same day, Rastigue met with Plaintiff. (ECF No.
48, PageID.983; ECF No. 44, PageID.760.) Plaintiff denied all of the complaints made
against her. (ECF No. 44-9, PageID.876-78.) On the same day, Plaintiff sent Laurita
Thomas of Defendant's Human Resources Department and Pamela Heatlie of
Defendant's Office for Institutional Equity an e-mail, claiming that she was being subject
to intimidation, retaliation, threatening behavior, and misconduct. (ECF No. 48-34.)
Plaintiff's e-mail recalled her May 11 discussion with Lawter pertaining to, *inter alia*,
Taylor's "Pending Federal Lawsuit" against Defendant and her being named as a
witness; her e-mail also communicated her feelings that, in May, her "concerns fell on
deaf ears" and that she knew her "continued employment would be brief."[3] (*Id.*,
PageID.1289.) She sent a nearly identical e-mail to Masson. (ECF No. 48-14.)

---

[3]     Plaintiff, in this e-mail, also mentions a "Lawsuit brought forward by the
Department of Justice on behalf of" two former employees. (ECF No. 48-34,
PageID.1289.) Plaintiff seemingly refers to a previous consent decree in which
Defendant stipulated that, going forward, it would transfer disabled employees who
could no longer perform the essential functions of their job "to a vacant position that is
equivalent in terms of pay, status, or other relevant factors (e.g., benefits, geographical
location) if the employee is qualified or the position." (ECF No. 48-2, PageID.1009.) In
the words of David Masson, Defendant's Senior Associate General Counsel in its Office
of General Counsel, the consent decree centered around Defendant's obligations as it
pertained to "the transfer of disabled employees to open jobs." (ECF No. 48-3,
PageID.1023.)

On September 19, 2017, Garrett-Owens sent an email to Rastigue and Lawter to discuss the "best approach to ending [Plaintiff's] employment with the department," remarking that due to multiple issues over recent years, she "no longer demonstrates the qualities we need represented by our supervisors." (ECF No. 44-10, PageID.881; ECF No. 44-4, PageID.837.) Garrett-Owens discussed the possibility of offering a settlement agreement, noting "[Plaintiff's] years of service and lack of documented discipline." (ECF No. 44-10, PageID.881.) In the event Plaintiff rejected the settlement offer, Rastigue suggested that Defendant convene a Disciplinary Review Conference ("DRC") to seek her discharge for unsatisfactory performance. (*Id.*) In his deposition, Lawter explained that generally, Defendant attempts to merely demote an employee if somebody could be discharged, but that they "couldn't find anything" for Plaintiff because the "charges that were laid against her would not be appropriate for even a custodian." (ECF No. 44-4, PageID.837.)

Rastigue met with Plaintiff on September 21 to explain that the investigation would likely lead to a DRC unless Plaintiff chose to sign a settlement agreement; Plaintiff had twenty-one days to make this decision, and Plaintiff later declined Defendant's settlement offer. (ECF No. ECF No. 48, PageID.988-89; ECF No. 44, PageID.761-62.) Thus, Defendant held a DRC on November 10, 2017. (ECF No. 48, PageID.989; ECF No. 44, PageID.761, 767.) The DRC committee was made up of Garrett-Owens, Rastigue, and Donner. (ECF No. 44, PageID.767.) Although Brancheau was not present for the DRC (ECF No. 44, PageID.767), Brancheau had a conversation with Donner to provide her own input on Plaintiff's situation, and Brancheau recommended removing Plaintiff from her role at the DRC. (ECF No. 48-18,

PageID.1183-84.) The committee of Garrett-Owens, Rastigue, and Donner conducted the DRC, and Plaintiff denied any express or implied allegations of impropriety. (ECF No. 44-20, PageID.945; ECF No. 44-22, PageID.953.)

On November 15, 2017, Defendant terminated Plaintiff's employment. (ECF No. 44-22, PageID.953.) The termination letter indicates that, at the DRC, she was charged with "[u]nsatisfactory work performance, specifically creating a hostile work environment of fear, intimidation, and harassment of your staff and colleagues." (*Id.*) The letter explained that Plaintiff had an opportunity to respond and that she had given "three names of employees to talk to on [her] behalf which [she] said would provide information to attest to [her] ability as a supervisor," although two could not be reached and one only worked for her for a short period of time. (*Id.*) According to the letter, Plaintiff's account of the facts was "very different and lacked credibility from the other staff members' statements including those from management personnel." (*Id.*)

## II. STANDARD

To prevail on a motion for summary judgment, a movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presenting evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013). There is no

8

requirement that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

For a court to deny summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "The essential question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (internal quotations omitted). All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## III. DISCUSSION

Plaintiff maintains that Defendant's adverse employment action against her, following her advocacy for Taylor, constituted retaliation in violation of the Rehabilitation Act. (*See* ECF No. 48, PageID.992-99.) Plaintiff's claim is rooted in indirect evidence;

thus, the court will analyze the Plaintiff's claim under the familiar *McDonnell Douglas* burden-shifting paradigm. *See A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). For the reasons explained below, Plaintiff ultimately fails to meet her burden at the summary judgment stage.

Under the *McDonnell Douglas* framework, Plaintiff must first demonstrate a *prima facie* case of retaliation under Section 504 of the Rehabilitation Act by showing that (1) she engaged in protected activity under Section 504, (2) Defendant knew of the protected activity, (3) Defendant took adverse employment action against Plaintiff, and (4) there was a causal connection between the adverse action and Plaintiff's protected activity. *Id.* (citing *Shelby Cty.*, 711 F.3d at 697). In a retaliation case, this burden "is not onerous, but one easily met." *Id.* (quoting *Shelby Cty.*, 711 F.3d at 697). Once "this low hurdle" is cleared, *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001), the burden of production then shifts to the defendant to show that there was a "legitimate, non-discriminatory basis" for the adverse employment action. *See Kirilenko-Ison*, 974 F.3d at 661. Once the defendant does so, the burden then shifts back to the plaintiff to show, by a preponderance of the evidence, that the defendant's proffered reasons "were not its true reasons," but instead were a pretext for retaliation. *Id.* (quoting *Shelby Cty.*, 711 F.3d at 697).

## A. *Prima Facie* Case of Retaliation

Defendant avers that it is entitled to summary judgment because Plaintiff has failed to make out a *prima facie* case of retaliation. Specifically, Defendant contends that Plaintiff (1) was not engaged in protected activity for purposes of Section 504 (ECF No. 44, PageID.772-75) and (2) cannot establish the requisite causal connection for a case of retaliation.[4] (*Id.*, PageID.777.) The court disagrees.

First, Plaintiff has proffered sufficient evidence to establish a genuine dispute as to whether she engaged in protected activity. Section 504 incorporates the Americans with Disabilities Act ("ADA") provisions prohibiting retaliation. *See* 29 U.S.C. § 794(d). The ADA proscribes retaliation against an individual "because such individual has [1] opposed any act or practice made unlawful by this chapter or because such individual [2] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *See* 42 U.S.C. § 12203(a); *see also* 29 C.F.R. § 33.13 (stating that no employer may "discharge, intimidate, retaliate, threaten, coerce or otherwise discriminate against any person" for seeking to enforce Section 504). Thus, the Rehabilitation Act and ADA protect individuals who either (1) oppose unlawful conduct or (2) participate in a proceeding under the disability discrimination laws, and since the Acts have a similar scope and aim, "[retaliation] cases construing either Act are generally applicable to both."[5] *Shelby Cty.*, 711 F.3d at 697.

---

[4]     The parties do not appear to dispute whether Defendant had knowledge of any protected activity (assuming Plaintiff can establish the protected activity element) and that Defendant took adverse employment action against Plaintiff.

[5]     Given their similar language, courts also look to cases assessing Title VII's anti-retaliation provisions insofar as the opposition or participation clause are at issue. *See Zainulabeddin v. Univ. of S. Fla. Bd. of Trustees*, 749 F. App'x 776, 782 (11th Cir. 2018)

The crux of Defendant's argument is that Section 504 prohibits retaliation against any individual because of his or her opposing practices made unlawful by Section 504 or otherwise seeking to enforce rights under Section 504. (ECF No. 44, PageID.772.) In other words, Defendant maintains that, to establish a retaliation claim, the alleged "protected activity by plaintiff needs to relate to Section 504 of the Rehabilitation Act." (*Id.*, PageID.773.) According to Defendant, Plaintiff's alleged "protected activity" is the May 11 meeting to "let Lawter know that [Plaintiff] believed she would be a witness on behalf of Robert Taylor at Taylor's *worker's compensation proceeding* and that she intended to tell the truth and would not perjure herself. Plaintiff claims that is where it all began." (*Id.*, PageID.773-74 (emphasis in original).) In short, Defendant contends Plaintiff cannot establish that she engaged in protected activity because Plaintiff claims merely that she "was retaliated against for announcing the prospect that she might be a witness for Robert Taylor at Taylor's worker's compensation proceeding," and such an activity is "not protected activity for purposes of Section 504." (*Id.*, PageID.774.)

Under Section 504, "protected activity" is not as narrow in scope as Defendant argues. Defendant would have the court impose a requirement that, to establish "protected activity," Plaintiff must have specifically informed Defendant that she has testified in support of Taylor in a disability discrimination action. (ECF No.44, PageID.775 ("Even if Zarza was nevertheless under some mistaken impression that she might at some point become a witness in connection with Taylor's federal court case, it would not amount yet to the type of protected testifying or participation in a proceeding

_____

(citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).

that Section 504 and the ADA require in order for it to be [protected] activity . . . .").) But, as noted above, there is both a participation clause and opposition clause under the ADA.[6] Thus, while "participation" in a proceeding brought under the disability discrimination laws may be sufficient to establish protected activity, it is not necessary— opposition to discriminatory practices is equally protected by Section 504. Indeed, while vague charges of discrimination are insufficient to demonstrate protected conduct, *Land v. S. States Coop., Inc.*, 740 F. App'x 845, 850 (6th Cir. 2018), "complaints to management and less formal protests of discriminatory employment practices" constitute protected activity under the relevant disability statutes. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 532 (6th Cir. 2020) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)); *cf. Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) ("[Title VII's] opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.").

Here, as early as May 11, Plaintiff began voicing her opinion that Defendant mishandled accommodating Taylor. Lawter testified in his deposition that when Plaintiff, Miller, and Sawicki first spoke to him, most of the conversation revolved around Taylor—they alleged "that [Donner] said she accommodated him," but that in reality,

---

[6]     Although Defendant acknowledges the opposition clause, Defendant did not, either in its initial brief or reply brief, address whether Plaintiff established protected activity for her opposition to Defendant's actions. Defendant rests its argument as to this element on the participation clause, that is, whether Plaintiff had some connection with or in any manner participated in Taylor's federal disability discrimination lawsuit.

Defendant did not do so. (ECF No. 48-12, PageID.1145.) Plaintiff, along with Miller and Sawicki, also demonstrated serious concern that Donner might retaliate against them for their belief that Donner did not do enough to help Taylor, and a discussion was held about how Taylor had filed a lawsuit against Defendant. (*Id.*; ECF No. 44-11, PageID.890 ("Ms. Donner's claim that we did everything we could to assist this employee was inaccurate.").) Moreover, the May 16 e-mail conversation between Brancheau and Garrett-Owens—just five days after Plaintiff initially brough her concerns to Lawter—confirms that Defendant was aware that Plaintiff was advocating for Taylor and his unaccommodated needs. (ECF No. 48-15.) Brancheau wrote to Garrett-Owens that Plaintiff believed "[Donner] was out to get [Taylor]" and that "[they] didn't accommodate his restrictions." (*Id.*, PageID.1158.) Plaintiff at least between May and June brought complaints to her superiors regarding Defendant's failure to take all necessary steps to accommodate Taylor, to the point that Lawter commented that "Taylor's name seems to just swirl around wherever Karen is." (ECF No. 48-12, PageID.1147.) Because "advocating for members of a protected class is a protected activity for purposes of retaliation claims" under the Rehabilitation Act, the court finds that Plaintiff has at least proffered enough evidence to raise a genuine dispute as to whether she engaged in protected activity; a reasonable juror could find that she advocated for Taylor's accommodations and opposed Defendant's treatment of him. *See Kirilenko-Ison*, 974 F.3d at 662 (citing *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010)); *accord See M.L. v. Williamson Cty. Bd. of Educ.*, 772 F. App'x 287, 291 (6th Cir. 2019) ("Advocating for accommodations under the disability laws is protected activity.") Thus, although Defendant rests its argument on

a *participation clause* analysis, a genuine dispute exists as to whether Plaintiff engaged in protected activity under the *opposition clause*.[7]

Plaintiff also has the burden of establishing a causal connection between the adverse employment action and her protected activity. *Kirilenko-Ison*, 974 F.3d at 664; *Shelby Cty.*, 711 F.3d at 697. Defendant argues that Plaintiff cannot establish this element of her *prima facie* case because Plaintiff's initial protected conduct—her May 11 meeting with Lawter—was completely insulated from the investigation that ultimately led to any adverse employment action. (ECF No. 44, PageID.776.) Defendant contends that there is no causal connection between her concerns raised in May and June to her firing, but instead, her termination was the result of an independent investigation sparked by Price's concerns. (*Id.*, PageID.776-77.)

To show causation, a plaintiff is required to "produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" in the absence of the plaintiff's protected conduct. *Kirilenko-Ison*, 974 F.3d at 664 (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)) "This Circuit has not adopted a uniform approach on whether a causal connection may be established solely on the basis of temporal proximity." *Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1, 5-6 (6th Cir. 2012). The Sixth Circuit has concluded in the past that "temporal proximity alone is sufficient to establish a prima facie case of . . . retaliation," but at the same time has found temporal proximity alone to be insufficient to establish a causal link for purposes of retaliation. *See id.* (collecting cases discussing

---

[7]     To the extent Plaintiff advances her Section 504 claim under the participation clause, she will not be able to do so. The court will more fully address this issue below.

the contradicting standards for causation); *Kirilenko-Ison*, 974 F.3d at 664 (explaining

that in "some circumstances," a plaintiff establishes an "an inference of causation . . .

solely from the closeness in time between the point at which an employer learns of an

employee's protected activity and the point at which it takes an adverse action against

that employee"); *Weigel*, 302 F.3d at 381 (quoting *Johnson v. Univ. of Cincinnati*, 215

F.3d 561, 582 (6th Cir.2000)) (noting that courts have found that a "causal link may be

shown through knowledge combined with closeness in time," although generally no

single consideration is dispositive). Essentially, in cases where "an adverse employment

action occurs very close in time after an employer learns of a protected activity, such

temporal proximity between the events is significant enough to constitute evidence of a

causal connection for the purposes of satisfying a prima facie case of retaliation. But

where some time elapses between when the employer learns of a protected activity and

the subsequent adverse employment action, the employee must couple temporal

proximity with other evidence of retaliatory conduct to establish causality." *Mickey v.

Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *accord Eaves v. Eye Ctrs. of

Tenn., LLC*, No. 2:18-CV-00072, 2020 WL 134116, at *6 (M.D. Tenn. Jan. 13, 2020)

(discussing the Sixth Circuit's approach to establishing causation in retaliation claims).

Here, Plaintiff brought concerns to Lawter on May 11 and similar concerns to

Rastigue and Brancheau on June 28. (ECF No. 48-21, PageID.1227; ECF No. 48-12,

PageID.1146.) Plaintiff was placed on administrative leave by Lawter by September 11,

which, following her refusal enter into a settlement agreement, led to her ultimate

termination in November. (ECF No. 44, PageID.760-62; ECF No. 48, PageID.982, 988-

89.) Thus, within approximately three to four months of her complaints to Defendant

about its mishandling of Taylor's accommodations, Plaintiff was subjected to adverse employment action. In the Sixth Circuit, the causation element has typically been deemed satisfied "only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *See, e.g.*, *Dixon v. Gonzalez*, 481 F.3d 324, 334 (6th Cir. 2007) (collecting cases standing for the proposition that adverse action taken in weeks or months is sufficient to show a causal link); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (holding, in a Title VII retaliation case, that a causal connection was established where employee placed was terminated within six months of protected conduct); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding that a lapse of three months was sufficient to show a causal connection based on temporal proximity in Title VII retaliation action); *Kirilenko-Ison*, 974 F.3d at 667 (noting, in a retaliation case under the Rehabilitation Act, the adverse employment action took place "within a few months" of advocating for a disabled individual); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (finding temporal proximity of three months to be sufficient to establish causation in a Family and Medical Leave Act retaliation case).

In addition to the temporal proximity, Plaintiff also presented evidence that her superiors or other decisionmakers were disgruntled by the fact that she made her complaints. For example, Miller testified that Lawter's "face turned beet red" during the May 11 meeting, something a reasonable juror may find to be indicative of anger or disdain towards Plaintiff, and Lawter placed Plaintiff on administrative leave. (ECF No. 44, PageID.760; ECF No. 44-12, PageID.897-98.) Similarly, Garrett-Owens and Brancheau exchanged e-mails on May 16 that could possibly demonstrate either some

surprise or displeasure with Plaintiff raising her concerns. (ECF No. 48-15, PageID.1158; ECF No. 48-6, PageID.1072.) The DRC committee, which was ultimately responsible for her termination, was made up of Rastigue, Garrett-Owens, and Donner, at least two of whom either had a personal stake in or expressed an arguably negative reaction to Plaintiff's complaints. Although the additional evidence of potential retaliatory motive is not overwhelming, it is at least enough to establish a causal connection when coupled with the temporal proximity of her placement on administrative leave and her termination. At this stage, she has produced sufficient evidence from which a reasonable juror could draw an inference that the adverse action would not have been taken in the absence of her opposition to Defendant's actions. *Kirilenko-Ison*, 974 F.3d at 664.

Insofar as Plaintiff brings a claim under the participation clause for her testimony in Taylor's case, however, Plaintiff cannot establish a *prima facie* case due to a combination of a failure to demonstrate the protected activity and causation elements. First, Plaintiff has failed to adduce sufficient evidence that, at any time prior to her dismissal, she had any expectation of participating as a witness in Taylor's federal disability proceedings.[8] At her deposition, she indicated that on her May 11 meeting with Lawter she only discussed her potential participation in Taylor's *workers' compensation proceeding*:

Q: What was your purpose in asking for the meeting with Mr. Lawter?

A:  My purpose was to make John aware that I had been named a witness in Mr. Taylor's lawsuit against the University of Michigan, that I was going

_____

[8]     The court will assume for purposes of this analysis only that if Plaintiff was indeed named as a witness in Taylor's federal disability case, such would be sufficient to constitute protected activity under Section 504.

to testify truthfully in that matter. I was not going to perjure myself. I expressed concern to him about retaliation and being fired as a result of that. I asked for his help and protection because I knew that I was going to be fired.

Q:  Let me see if I can take those and sort of break it down a little bit. When you say that you had been named as a witness, would I be correct you're referring to Robert Taylor's workers' compensation proceeding?

A: Yes.

. . .

Q: How did you become aware that you were going to be called as a witness at Robert Taylor's workers' compensation proceeding?

A: Mr. Taylor informed me that he was naming me as a witness.

(ECF No. 44-11, PageID.888.) To be sure, Plaintiff testified that she "brought more than one concern" to Lawter on May 11, and that there was "more than one thing discussed during that meeting." (ECF No. 44-11, PageID.890-91.) But while the record establishes that during this meeting she engaged in protected activity by *protesting* Defendant's previous actions against Taylor, there is no admissible evidence purporting to show Taylor either at this point had any expectation of *participating* in Taylor's disability action in some way or that Defendant knew about her intention to do so.[9] In short, although

---

[9]    Insofar as Plaintiff purports to rely on her September 15 and 18 e-mails to human resources and Masson which harken back to the May 11 discussion about her being named as a witness in a "Pending Federal Lawsuit," she cannot do so. First, Plaintiff did not send these to anybody who played a role in her termination. Second, at this point, the "wheels of termination had already been put into the motion"—evinced by her placement onto administrative leave on approximately September 11—so a reasonable juror could not conclude that Plaintiff's participation in Taylor's disability action was a cause of her termination. *Cf. Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 557 (6th Cir. 2010) (explaining that, in a Family and Medical Leave Act retaliation case, an employee cannot "insulate himself from a pending dismissal by opportunistically invoking" statutory protections) (internal quotations omitted). Finally, if anything, her statements in these e-mails were mere conjecture about her potentially testifying in Plaintiff's federal disability proceeding, and such evidence is insufficient to overcome Defendant's motion for summary judgment on this point. *Arendale v. City of Memphis*,

Plaintiff indicates she had a conversation with Taylor about her potential testimony in the workers' compensation proceeding, there is no evidence that a similar conversation took place regarding her being named as a witness in Taylor's federal disability action. In fact, it is not entirely clear that she even knew Taylor's federal disability lawsuit existed at the time she made her complaints. Plaintiff cannot maintain a claim under the disability discrimination laws under these circumstances. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046-47 (6th Cir. 2014) ("The ADA is a discrimination statute and does not protect an employee who participates in arbitration proceedings contesting employment decisions that do not involve any claims of discrimination."); *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143 (4th Cir. 2012) (holding that a retaliation claim under the ADA failed because "workers' compensation claim is not something . . .  covered by the ADA.").

Second, the only evidence of Plaintiff's intent to participate in Taylor's federal disability action—or any knowledge on Defendant's part of her intention to do so—arose in December 2018 when she was formally named as a witness, which is far too late. (*See Taylor v. Univ. of Mich.*, No. 17-11473, ECF No. 40.) At this point, Plaintiff had already been terminated for over a year. And Plaintiff failed to adduce any evidence, for example, that she had a conversation with Taylor or his attorney about being named potentially being named as a witness before this time. Given the chronology of events,

---

519 F.3d 587, 605 (6th Cir. 2008) ("In order to survive summary judgment, plaintiff cannot rely on conjecture or conclusory allegations"); *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (explaining that "mere personal belief, conjecture and speculation" are insufficient to support an inference for purposes of summary judgment).

Plaintiff cannot establish a causal connection between her participation as a witness and any adverse employment action against her.

In summary, Plaintiff has met her *prima facie* burden as it pertains to her opposition to Defendant's failure to properly accommodate Taylor and her advocacy in support of him. She has not done so insofar as her participation clause claims are concerned—it is her burden at this stage to adduce evidence relevant to the participation clause allegations, and she has failed to do so. Nonetheless, as it relates to her protected activity under the opposition clause, Plaintiff has met her "easy burden" of establishing a *prima facie* case. *Kirilenko-Ison*, 974 F.3d at 661.

### B. Legitimate Basis for Adverse Employment Action

Having cleared her "low hurdle," the burden of production now shifts from Plaintiff to Defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *Gribcheck*, 245 F.3d at 551. A defendant is not required to "persuade the court that it was actually motivated by the proffered reasons"; rather, it is sufficient "to raise a genuine issue of fact as to whether it discriminated against" a plaintiff by setting forth evidence showing the reasons for its actions. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814-15 (6th Cir. 2011) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Here, Defendant has easily met its burden. Defendant has shown that a fellow custodial supervisor, Price, came forth on behalf of himself and other employees to share concerns regarding Plaintiff. (ECF No. 44, PageID.777.) As far as the record demonstrates, he did so independently without any influence of those who may have had some retaliatory motive against Plaintiff. Price's complaints, in turn, led to comprehensive witness interviews and a twelve-page investigative report

21

summarizing the complaints lodged against Plaintiff. (*Id.*) This report was considered by

the DRC committee, which ultimately discharged Plaintiff for "[u]nsatisfactory work

performance, specifically creating a hostile work environment of fear, intimidation, and

harassment of your staff and colleagues." (ECF No. 44-22, PageID.952.) This stated

reason was consistent with Price's initial complaints. The court finds that there is more

than sufficient evidence in the record to show that Defendant had a neutral, legitimate

reason to place Plaintiff on administrative leave and terminate her.

### C. Pretext

"After the defendant articulates its nondiscriminatory reasons for taking the

employment action against the plaintiff, the presumption of discrimination created by the

*prima facie* case drops out of the analysis." *Gribcheck*, 245 F.3d at 552 (citing *Wrenn v.*

*Gould*, 808 F.2d 49, 501 (6th Cir. 1987)). It then is a plaintiff's burden to demonstrate

that "a reasonable jury could find by a preponderance of the evidence that the

defendant's stated reasons are pretextual." *Id.* In other words, Plaintiff must show that

"the question of pretext is a genuine factual dispute." *Kirilenko-Ison*, 974 F.3d at 667

(citing *Provenzano*, 663 F.3d at 813). Plaintiff can show pretext by demonstrating

Defendant's reasons for its actions "(1) lack a basis in fact, (2) did not actually motivate

the [adverse action], or (3) were insufficient to motivate the [adverse action]." *Shelby*

*Cty.*, 711 F.3d at 702 (citing *Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007)).

The court finds that, viewing the record as a whole, Plaintiff has not met her burden at

this stage. Defendant's proffered reasons certainly had a basis in fact, motivated its

decision to place Plaintiff on administrative leave and terminate her, and otherwise were

sufficient to motivate any adverse action against her.

The investigation, in fact, revealed unsatisfactory work performance and that Plaintiff created a "hostile work environment of fear, intimidation, and harassment of [her] staff and colleagues." (ECF No. 44-22, PageID.952; ECF No. 48-19.) There was overwhelming evidence that would justify Plaintiff's termination, all of which was wholly irrelevant to Plaintiff's protected conduct. Statements given by Price and at least a dozen additional employees revealed, among a myriad of other things:

- "The way Karen treats the temps is terrible. She works them to death and yells at them all the time. People are so fearful of her that they don't want to come forward because they are literally afraid of her." (ECF No. 48-19, PageID.1213.)

- Plaintiff refers to employees "as bastards." (*Id.*)

- After being told by Donner to go home during the work day, Plaintiff "berated and yelled at [Price] for 2 hours after he was off the clock. [Plaintiff] told him his communication skills were terrible and that he needed to let her know when he was going to be off. He pointed out that he was letting her know and she kept yelling at him. She was trying to tell him what to do like she was his boss." (*Id.*)

- One employee, Terry Leach, opened his interview by apologizing to Brancheau "for lying . . .  when [Brancheau] did interviews about concerns with Karen in 2012." Leach explained that "he was so terrified of retaliation from [Plaintiff] that he couldn't tell the truth" at that time. (ECF No. 48-19, PageID.1214.)

- "Karen treats the temporary employees like dogs. She will take them into her office to discuss issues with them but is screaming so loud they can hear her through the closed door. However, much of the time, she yells at people in front of the entire group." (ECF No. 48-19, PageID.1215.)

- "She treats the temps like dirt. [One employee] was a good temp but wasn't where he was supposed to be so she fired him. She fires the good workers and keeps the problematic ones." (*Id.*)

- "[Plaintiff] told [Leach] that she wasn't hiring Jose because he didn't speak English and she couldn't do it." (*Id.*)

- "Karen goes after supervisors who don't go along with her." (*Id.*)

- "When Karen is gone, everyone is good but when she is at work the environment changes and everyone is on edge." (ECF No. 48-19, PageID.1216.)

- "Karen is a really, really mean person. She treats the temp terribly, yelling at Fanta instead of talking to her. The very first time [Plaintiff] met [Fanta] she was mean to [Fanta] and told [Fanta] if she didn't have her ID she couldn't work. When [Plaintiff] tells her to do things, she raises her voice and yells at her. . . . [Plaintiff] gives her temps poor evaluations, is very mean and yells at them, doesn't spend any time coaching or helping them." (ECF No. 48-19, PageID.1216.) The same employee noted that "it has been so stressful working here" under Plaintiff's supervision. (*Id.*)

- "Karen is one hot mess. . . . Karen is very vindictive and likes to tell people she will 'drain the blood out of the employees.' [An employee] has heard her saying that the supervisors are better than the custodians. Witnessed her calling [Price] out on sitting with them at a potluck, saying he was one of them now and needed to start acting like it." (ECF No. 48-19, PageID.1217.)

- "Most of her chewing out people is in public even though she says she will address issues in private." (ECF No. 48-19, PageID.1218.)

- "She is not very nice to the temps and gets on a power trip with them. Karen really doesn't like Fanta and talks down to her and is mean to her, She makes Fanta do all of the restrooms." (*Id.*)

- "Karen is mean and berates people. However, people are afraid of her and won't speak up against her because of the fear of retaliation." (*Id.*)

- "Karen always looks for the worst in every situation and never has a nice thing to say about anyone's work. If you want a good team, you should be encouraging them not jumping down their throats and being so negative." (ECF No. 48-19, PageID.1219.)

- One employee remarked that he "has worked many places and Karen is not fit to work here. She is out of it, loopy and he has never dealt with someone harassing him like she does. He feels like she is always thinking about how she can mess with them every day," and he also noted that "[Plaintiff] treats the temps like shit. They are afraid to say anything about their treatment." (ECF No. 48-19, PageID.1220.)

- "Everyone should be treated equally and Karen does not do this. Her staff are afraid of her. When he started a lot of people told him she was a horrible person and they were so glad they didn't work for her. She treats people unfairly and messes with their vacation time. She treats the temps terribly and

one even quit within 3 hours of working for her. She is always yelling at them and fires most of them. Instead of trying to help them in the confusing, large buildings she belittles them for not doing the work and fires them eventually. . . . [I]t was horrible that she told Scott (they could all hear) that he couldn't eat with his staff at the holiday party as he wasn't one of them anymore, he was a supervisor." (*Id.*)

- "[Plaintiff] makes situations worse than they have to be by accusing them of things." (*Id.*)

- An employee noted that he "doesn't know why [Plaintiff] doesn't like him, if it is because she didn't hire him or because he is black. She makes it hard for some reason," particularly because Plaintiff "takes her anger out on everyone." (*Id.*, PageID.1220-21.)

Numerous employees expressed their frustration with Plaintiff, and the report is replete with more specific, corroborated examples of Plaintiff's mistreatment of employees. (*See* ECF No. 48-19.) The report also details, *inter alia*, several accounts of unfair favoritism for one or two particular employees and an improper hiring practice involving a temporary employee named Jose. (ECF No. 48-25, PageID.1248.)

While the timing of her termination appears suspicious at first glance, the record clearly demonstrates that not a single individual at whom Plaintiff directed any of her protected conduct was a catalyst sparking any adverse employment action. Rather, a completely insulated, independent actor with no stake in Plaintiff's opposition to Defendant's treatment of Taylor was the impetus behind the investigation into Plaintiff's conduct as a custodial supervisor.[10] (ECF No. 48, PageID.973-74; ECF No. 44-3, PageID.829; ECF No. 44-5, PageID.846; ECF No. 44-4, PageID.840.) There is no

---

[10]    The manner in which Price brought his complaints demonstrates the severity of Plaintiff's actions. Price called Donner to talk in person because the matter was "extremely serious," prompting Donner to return campus despite her already having left work for the day. (ECF No. 44-3, PageID.829.) Price noted he and others "couldn't take it anymore" and that he should have brought his concerns to Donner sooner. (*Id.*) His conversation with Donner persisted for nearly two hours. (*Id.*, PageID.830.)

evidence to suggest any investigation into Plaintiff's misconduct would have been initiated unless these complaints by Price were brought forth—any allegation that the investigation began as a "sham" is plainly unsupported by the evidence before the court. And there were several others who shared substantially similar problems with Plaintiff as a custodial supervisor, none of whom appeared to be influenced by Donner, Lawter, or any superiors who may have been responsible for Plaintiff's termination.

Defendant presented these allegations to Plaintiff and gave her the opportunity to respond. On September 13, 2017, Rastigue and another human resources employee interviewed Plaintiff regarding the employees' complaints. (ECF No. 44-9, PageID.876.) Plaintiff was also given the chance at the DRC to "respond or provide relevant evidence to refute" the allegations, but of the three names Plaintiff provided to provide testimony on her account "two couldn't be reached and one stated that he worked for [Plaintiff] for a short period of time and it was 3 years ago."[11] (ECF No. 44-22, PageID.953.) Plaintiff denied all allegations against her at the time of her interview and the DRC, and she continued to deny them in her depositions taken in the present action. But at this stage, a "blanket denial [of] the employer's articulated reasons . . .  is not enough; a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive." *Irvin v. Airco*

---

[11]    Plaintiff complains that her friend and co-worker, Miller, was not interviewed and would later testify that she had never seen Plaintiff treat employees differently or speak to them in a demeaning manner; however, as Miller's deposition reveals, Miller and Plaintiff "had to supervise different buildings and crews," and she therefore only "sometimes" saw Plaintiff interact with her own custodians. (ECF No. 48-9, PageID.1111.) Miller's deposition also does nothing to rebut the numerous specific, individualized accounts of Plaintiff's misconduct proffered by Defendant's employees.

*Carbide*, 837 F.2d 724, 726 (6th Cir. 1987). Nothing in the record suggests that the allegations leading to Defendant's adverse employment actions lacked a basis in fact, did not motivate Defendant, or were insufficient to motivate Defendant.[12] Plaintiff's attempts to refute the notion that she ever mistreated any subordinate employees or co-workers presents nothing more than the "mere possibility" of a factual dispute. *Anderson*, 477 U.S. at 252.

Plaintiff also, to establish pretext, attempts to argue that the initial investigation into her conduct was either a sham or pretextual because Brancheau—who conducted the investigation—was biased against Plaintiff. Plaintiff relies on Brancheau's e-mail stating, "It is my understanding that Karen might testify for Robert Taylor in his court case, basically stating that [Donner] was out to get him, *we* didn't accommodate his restrictions, etc." (ECF No. 48, PageID.971 (emphasis added).) According to Plaintiff, this statement indicates that Brancheau played a role in the failure to accommodate Taylor, and therefore, any investigation conducted by Brancheau was improper. But the use of the word "we" is the only evidence Plaintiff presents to demonstrate Brancheau having any role in deciding whether to accommodate Taylor.[13] All of Plaintiff's complaints between May and June had to do with *Donner* failing to accommodate

---

[12]    To the extent Plaintiff argues she can demonstrate pretext by pointing to her strong performance record over the course of her employment, she has proffered only one performance review from 2012 in support of this proposition. (ECF No. 48-7.) Yet, even this performance review indicates that she should "work on" enhancing her "empathetic listening skills when dealing with staff members and others," which correlates with the complaints she received five years later. (*Id.*, PageID.1088.)

[13]    Brancheau's use of the word "we"—given the absence of any additional evidence to show Brancheau's personal involvement—is likely a general reference to the Custodial and Grounds Department as a whole.

Taylor—in this regard, the record is wanting of any evidence as to Brancheau's role in Taylor's firing.

And significantly, to the extent Plaintiff complains that Brancheau was, because of her alleged "bias," improperly "assigned . . . to investigate Plaintiff's *complaints concerning the fact that Defendant discriminated against Taylor based on his disability*," the record plainly contradicts any notion that Brancheau was assigned to do so. (ECF No. 48, PageID.972 (emphasis added).) First, Plaintiff cites a portion of Lawter's deposition testimony which does nothing to show Brancheau was assigned to investigate Plaintiff's complaints; rather, this portion of the transcript demonstrates that after *Price* made complaints to Lawter, Lawter then shared the information with Brancheau and asked her to investigate *Price's* complaints. (ECF No. 48-12, PageID.1147.) Second, Plaintiff claims that Brancheau "admits" she did not investigate Plaintiff's regarding Taylor's disability discrimination by citing Brancheau's deposition, but this is not what Brancheau stated in the portion of the deposition cited by Plaintiff. Instead, Brancheau testified that she was not "assigned" to investigate Plaintiff's claims or interview Plaintiff in the first place, despite what Plaintiff contends:

> Q: Okay. And [Plaintiff] makes some allegations of, regarding retaliation. . . . *Were you ever assigned to interview Ms. Zarza regarding her retaliation complaint?*
>
> A: No.
>
> Q: *Were you only involved in the investigation that you did with the twelve pages of notes that we just went through?* Is that the only time you investigated anything regarding Karen Zarza in 2017?
>
> A: Yes.

(ECF No. 48-18, PageID.1205 (emphasis added).) In short, Brancheau did not have a "conflict of interest" before investigating Plaintiff's misconduct, nor did Brancheau ever shirk any obligation to investigate Plaintiff's advocacy in support of Taylor.[14] Brancheau's investigation into Plaintiff's misconduct was the direct result of a genuine concern of Price.

Thus, Plaintiff has not produced sufficient evidence to show that there is a genuine issue for trial as it relates to pretext. A defendant's proffered reason "cannot . . . be a pretext for [retaliation] unless it is shown both that the reason was false, and that [retaliation] was the real reason." *Robinson*, 821 F. App'x at 529-30 (alterations in original) (quoting *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 283, 285 (6th Cir. 2012)). Plaintiff falls far short of meeting her burden and fails to cast doubt on the reasons for her termination; no reasonable juror could conclude that Defendant's offered reason was pretextual.

## IV. CONCLUSION

While Plaintiff met the easy burden of establishing a *prima facie* case, she has not proffered sufficient evidence to overcome Defendant's legitimate, nondiscriminatory reasons for placing her on administrative leave and ultimately terminating her. Given the

---

[14]    Similarly, the court rejects Plaintiff's argument that Garrett-Owens and Brancheau's e-mail May 16 e-mail exchange reveals any bias against her. While Brancheau asked Garrett-Owens if they could discipline Plaintiff for her complaints, she qualified the question by asking if they could discipline Plaintiff "[*w*]hen the evidence s*hows that Karen is not accurate*." (ECF No. 48-15, PageID.1158 (emphasis added).) Garrett-Owens did not reveal any bias against Plaintiff in her response, which noted that Lawter could discipline Plaintiff "[*i*]f the evidence clearly shows that Karen is wrong." (*Id.* (emphasis added).) A reasonable juror would not believe these two comments by Brancheau and Garrett-Owens—each of whom expressly stated that they must have evidence before taking any disciplinary action—demonstrated preconceived ill-will towards Plaintiff.

substantial evidence that she was unfit in her role due to her "creating a hostile work environment of fear, intimidation, and harassment of [her] staff and colleagues," a charge that has not been sufficiently rebutted, no reasonable jury could return a verdict for Plaintiff. (ECF No. 44-22, PageID.953) The central question for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," and the court holds that Plaintiff has not met her burden to justify presenting this case to a jury. *Troche*, 814 F.3d at 798. Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment (ECF No. 44) is GRANTED. A separate judgment will issue.

s/Robert H. Cleland            /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  August 2, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 2, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner            /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\MAZ\Civil\18-13862.ZARZA.MotionForSummaryJudgment.MAZ.3.docx